[No. C032876. Third Dist. June 13, 2000.]

TAHOE VISTA CONCERNED CITIZENS et al., Plaintiffs and Appellants, v.
COUNTY OF PLACER et al., Defendants and Respondents;
MICHAEL RAFTON et al., Real Parties in Interest and Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and IV.

## COUNSEL

Brandt-Hawley & Zoia and Rose M. Zoia for Plaintiffs and Appellants.

Anthony J. LaBouff, County Counsel, Joseph McInerney and Scott H. Finley, Deputy County Counsel, for Defendants and Respondents.

Feldman, Shaw & DeVore, Lewis S. Feldman and Michael J. McLaughlin for Real Parties in Interest and Respondents.

## OPINION

**NICHOLSON, J.**—Plaintiffs challenged the issuance of a conditional use permit, claiming the permit had not undergone sufficient environmental review and violated governing parking regulations. The trial court granted summary judgment against plaintiffs, finding they had failed to exhaust their administrative remedies on the environmental issue and the permit complied with the parking regulations. We affirm.

### UNDISPUTED FACTS

On or about December 15, 1997, real parties in interest (real parties) applied to defendant County of Placer (County) for a conditional use permit to redevelop a portion of their Vista Shores Resort. The resort is located on two adjacent parcels divided by state Highway 28 in an unincorporated area known as Tahoe Vista.

One parcel fronts on Lake Tahoe (the lakefront parcel). The lakefront parcel contains eight motel units. The other parcel located immediately

across Highway 28 (the mountainside parcel) contains 22 motel units, a restaurant, an office, and employee housing quarters.

Under the permit, real parties would demolish the eight units on the lakefront parcel, and replace them with 22 units in 4 two-story buildings. Of the 22 units, two would have three bedrooms, 16 would have two bedrooms, and four would contain one bedroom. Each unit would also have a living room. The new resort would also have one full-time employee and three part-time employees.

Project plans depict a typical three-bedroom unit sleeping as many as nine people, not counting any who may sleep in the living room. The plans depict a two-bedroom unit accommodating as many as six people, and a one-bedroom unit accommodating two people, again not counting any others who may sleep in the living rooms.

The County assigned different file numbers to each approval or review required from the County for the project. The staff designated the conditional use permit application as file No. CUP-2274, and designated the environmental review required for the use permit application as file No. EIAQ-3354. EIAQ refers to an "Environmental Impact Assessment Questionnaire [that] is used as an initial study to evaluate potential impacts and mitigation measures of a specific project."

The North Tahoe Community Plan, promulgated jointly by the County and the Tahoe Regional Planning Agency (TRPA), required development projects to provide a minimum amount of on-site automobile parking spaces as set forth in a parking demand table (the Parking Demand Table). The Parking Demand Table required the proposed project to provide one parking space for each full-time administrative employee, one space for every two other full-time employees, one space for every three part-time employees, and, of most importance here, one space for each "guest room or unit."

Real parties stated the project would require one full-time employee and three part-time employees. County staff thus determined the Parking Demand Table required the project to provide 24 on-site parking spaces: one for each of the 22 units, one for the one full-time employee and one for the three part-time employees. The proposed project included 26 on-site parking spaces, exceeding by two the minimum number County staff claimed the Parking Demand Table required.

Pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] County staff determined the proposed project would not have a significant effect on the environment if developed and operated subject to certain conditions and mitigation measures. Staff thus proposed the project be approved pursuant to a negative declaration instead of an environmental impact report (EIR). The proposed negative declaration was released for public review and comment on April 3, 1998.

During the public comment period, a planning consultant, Basin Strategies, and an attorney who both represented plaintiffs and neighboring property owners Larry Kramer and Sharon Kramer (collectively the Kramers) submitted letters to the County asserting the proposed project created significant environmental impacts requiring the County to review the project by means of an EIR.

On June 25, 1998, the County Planning Commission (Planning Commission) convened a public hearing on the permit application. The letters just mentioned seeking preparation of an EIR were included in the staff report to the Planning Commission. The Kramers and their attorney appeared at the hearing and voiced their opposition, claiming the project provided inadequate parking. Nonetheless, the Planning Commission unanimously approved the negative declaration and approved issuing the conditional use permit. The Planning Commission subsequently filed a notice of determination as required by CEQA on July 2, 1998, and issued conditions of approval in August 1998.

Following the conclusion of the Planning Commission's hearing, the Kramers immediately appealed the Planning Commission's action to the defendant County Board of Supervisors (Board of Supervisors) pursuant to County Code section 25.140.[2] They lodged their appeal by means of a form furnished by the County. The form lists different types of approvals of applications which could be appealed, including applications for environmental review, and asks the appellant to check all those that apply. The Kramers specified they were appealing the application for use permit No. CUP-2274. They did not specify they were appealing from any application for environmental review. (The form allowed the appellant to indicate an appeal from "Env. Review EIAQ-____.") The Kramers stated their reason for the appeal was "not enough parking."

---

[1] All subsequent references to sections of statutes are to the Public Resources Code unless otherwise noted.

[2] We use the term "County" to refer collectively to the County and the Board of Supervisors except where specified otherwise.

The hearing on the appeal was scheduled for August 11, 1998. Public notice of the hearing listed the appeal's subject as "Planning/Negative Declaration (EIAQ-3354) Conditional Use Permit - Vista Shores Resort." The Board of Supervisors' agenda listed the appeal in the same fashion.

The staff report prepared for the Board of Supervisors included a copy of the negative declaration and the Planning Commission's findings approving the negative declaration, and stated the Planning Commission determined the negative declaration was adequate. The staff report noted the appeal was an appeal "of the Planning Commission's action to approve a Negative Declaration and Conditional Use Permit . . . . The reason for the appeal was cited as insufficient parking on the site."

The staff report also stated that during the comment period on the negative declaration, letters were received from representatives of the Kramers relating to the adequacy of the negative declaration and other matters. However, the report continued, "[w]hile the above issues were discussed at the June 25, 1998 Planning Commission hearing, it appears that the only issue that now remains, as indicated in the appeal filed on June 25, 1998, is the plaintiffs' concern that there is inadequate parking for the proposed use." The staff report did not include the letters from the Kramers' representatives that had been presented to the Planning Commission.

The staff report also explained how County staff applied the Parking Demand Table to this project: "The Parking Demand Table for the North Tahoe Community Plans indicates a parking requirement of one space per guest room or unit. Based on this standard, the required parking for this project is 24 spaces with parking for employees. A total of 26 parking spaces are proposed by the developer [on the lakefront parcel]. As indicated, the applicant proposed 22 units or 38 bedrooms. [The project actually contains 42 bedrooms.] Both Placer County [Planning Department] and TRPA required one parking space per unit instead of one per guest room. It is the [staff's] position that this standard is appropriate for this development. In addition, the developer has indicated that overflow parking for this project is available across Highway 28 on [the mountainside parcel]. . . . If the Board [of Supervisors] chooses a condition can be imposed requiring an appropriate deed restriction which documents the relationship of the two parcels."[3]

The staff report recommended the Board of Supervisors uphold the Planning Commission's action by denying the appeal and adopting new findings.

---

[3]Plaintiffs state TRPA conditionally approved the proposed project sometime in February 1998, with 26 parking spaces located on the lakefront parcel as proposed before the County.

The two proposed new findings relevant here read: (1) "The Negative Declaration (EIAQ#-3354) prepared for Vista Shores Resort has been considered prior to approval of the project. It is determined to be adequate to serve as the environmental documentation for this project and satisfies all the requirements of CEQA"; and (2) "The proposed parking for the project is consistent with the Parking Demand Table for the North Tahoe Community Plans."

At the appeal hearing, planning staff opened its presentation by noting: "The [plaintiffs] in this case have only appealed the parking issue at this time. So there [were] some other issues that—during the Planning Commission hearing that did come up. The [plaintiffs], however, seem to be satisfied with that and have only appealed the parking issue."

No one who either testified orally at the appeal hearing or submitted written comments for that hearing questioned whether the County should have reviewed the project's environmental impacts by means of an EIR instead of a negative declaration. Except for one instance, all testimony concerned the application of the Parking Demand Table. One speaker ventured into a topic other than parking (it did not concern the negative declaration or CEQA), but the chairman reminded the speaker: "We're here to hear [an] appeal on—on the parking. I think we have to stay focused on that." Moments later, when asking for additional speakers, the chairman again directed the focus of the hearing: "Would anybody else like to speak in opposition to the parking requirements?"

Regarding the parking issue, County staff again explained how the Parking Demand Table required one space per unit or guest room. Since both staff and TRPA had imposed the one-space-per-unit standard on this project, the County proposed the Board of Supervisors impose the same standard. Staff also noted the availability of off-site parking on the mountainside parcel to accommodate any overflow.

Plaintiffs and their representatives argued the number of bedrooms in the proposed project required parking based on a one-space-per-guest-room standard. A traffic engineer retained by plaintiffs testified the project could accommodate as many as 114 people a night. He noted the Urban Land Institute's parking standards would recommend the project have 33 spaces, seven more than originally proposed. However, he argued the project should be viewed more similar to a multifamily dwelling than a motel, and that under Placer County Code parking requirements for multifamily dwellings, 48 parking spaces should be required for the project.

The Board of Supervisors voted unanimously to deny the appeal and to adopt the findings proposed by staff, including the findings that approved the negative declaration and that found the project complied with the Parking Demand Table. The Board of Supervisors also imposed an additional condition requiring the real parties to record a reciprocal parking agreement identifying 10 parking spaces on the mountainside parcel to serve as overflow parking for the project. As a result, the project was approved with 26 parking spaces on the lakefront parcel and an additional 10 spaces on the mountainside parcel for overflow, bringing the total number of available parking spaces reserved for the project to 36. The Board of Supervisors subsequently filed a notice of determination under CEQA on August 21, 1998.

PROCEDURAL HISTORY

The Kramers and other interested parties (collectively plaintiffs) thereafter filed a verified petition for writ of mandate in the superior court on September 21, 1998. The petition contained two causes of action. The first alleged the County violated CEQA by approving the project by means of a negative declaration and without preparing an EIR. The second cause of action alleged the project violated the Parking Demand Table and the North Tahoe Community Plan.

On December 30, 1998, real parties filed a motion for summary judgment against the petition.[4] They sought judgment against plaintiffs' first cause of action based on the defense of failure to exhaust administrative remedies. Real parties claimed plaintiffs failed to appeal the approval of the negative declaration to the Board of Supervisors, and thus were barred from raising that issue in their petition. Real parties sought judgment against plaintiffs' second cause of action claiming substantial evidence supported the County's application of the Parking Demand Table and approval of the project's proposed number of parking spaces.

On December 31, 1998, the day after real parties filed their motion for summary judgment, plaintiffs filed a stipulation and proposed briefing schedule for a hearing on their writ petition. The stipulation was signed by counsel for all of the parties in this action. Counsel for real parties and the County actually signed the proposed stipulation on December 16, 1998. Counsel for real parties returned the executed stipulation to counsel for plaintiffs on that date by fax, informing plaintiffs that notwithstanding the stipulation, real parties anticipated bringing a summary judgment motion as

[4]The County joined real parties' motion by notice dated January 14, 1999.

quickly as possible. The stipulation was silent concerning the summary judgment motion. The trial court signed the stipulation on December 31.

Plaintiffs filed an opposition to the motion for summary judgment and a separate statement of undisputed facts dated January 19, 1999. As to the motion against their first cause of action, plaintiffs argued they had exhausted their administrative remedies as required by CEQA. As to the motion against their second cause of action, however, plaintiffs did not argue the merits of the motion in their points and authorities. Instead, plaintiffs asked the court to continue the hearing on this matter because the parties had already agreed to a briefing and hearing schedule on the writ petition where the County's application of the Parking Demand Table would be addressed.

On February 2, 1999, the trial court called real parties' motion for summary judgment for hearing. Because the court had not had an opportunity to review the papers, it did not issue a tentative ruling and took the matter under submission without counsel for each of the parties offering any oral argument.

On February 17, 1999, plaintiffs filed an opening brief in support of their writ petition.

On March 18, 1999, the trial court issued its ruling on submitted matter and granted real parties' motion for summary judgment. As a preliminary matter, the trial court denied plaintiffs' request for a continuance. The trial court reasoned the setting of a briefing schedule and hearing date on a writ of mandate was the equivalent of setting a trial date in a regular civil action. There was no bar to bringing a motion for summary judgment in a civil action simply because a trial date had been set.

The trial court concluded plaintiffs had not demonstrated the existence of any triable fact regarding the County's application of the Parking Demand Table. It determined the evidence presented by real parties demonstrated the County complied with the requirements of the Parking Demand Table.

The trial court's ruling contained no discussion regarding real parties' defense of failure to exhaust administrative remedies against plaintiffs' first cause of action. By letter to the court dated March 23, 1999, plaintiffs informed the court of the ruling's omission of any discussion of the exhaustion issue.

On April 9, 1999, the trial court took the following actions:

(1) It signed and filed an order prepared by plaintiffs' counsel granting the motion for summary judgment only as to plaintiffs' second cause of action

(the Parking Demand Table action). This order is silent regarding plaintiffs' first cause of action or real parties' motion based on the exhaustion defense.

(2) The trial court signed and filed an order prepared by real parties' counsel granting the motion for summary judgment in its entirety, finding plaintiffs failed to exhaust their administrative remedies in order to challenge the negative declaration and finding the County complied with the Parking Demand Table and substantial evidence supported the County's findings on that issue.

(3) The trial court signed and entered a judgment also prepared by real parties' counsel decreeing plaintiffs take nothing by their petition.

Counsel for real parties gave plaintiffs notice of the court's entry of judgment. Plaintiffs thereafter filed their notice of appeal from the trial court's judgment.

DISCUSSION

I

*Standard of Review*

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant is entitled to summary judgment if a necessary element of the plaintiff's cause of action cannot be established or if there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (o)(2).)

" 'On review of a summary judgment in favor of the defendant, we review the record de novo to determine whether the defendant has conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of a trial.' " (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1709 [50 Cal.Rptr.2d 323].)

"Because the trial court's determination is one of law based upon the papers submitted, the appellate court must make its own independent determination regarding the construction and effect of the supporting and opposing papers. We apply the same three-step analysis required of the trial court. We begin by identifying the issues framed by the pleadings since it is these

allegations to which the motion must respond. We then determine whether the moving party's showing has established facts which justify a judgment in movant's favor. When a summary judgment motion prima facie justifies a judgment, the final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]" (*Hernandez v. Modesto Portuguese Pentecost Assn.* (1995) 40 Cal.App.4th 1274, 1279 [48 Cal.Rptr.2d 229].)

Since plaintiffs appealed from the trial court's judgment, which judgment granted summary judgment to real parties against the petition in its entirety pursuant to the order prepared by real parties' counsel, and since we review the real parties' motion for summary judgment independent of any ruling by the trial court, we give no heed to the trial court's order of April 9 prepared by plaintiffs' counsel.

II

*Exhaustion of Administrative Remedies*

Plaintiffs claim they exhausted their administrative remedies and are entitled to challenge the County's decision not to prepare an EIR as a result of their complying with the requirements of section 21177. That statute reads in pertinent part: "(a) No action or proceeding may be brought pursuant to [CEQA] unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before issuance of the notice of determination." (§ 21177, subd. (a).)

Plaintiffs assert they or their representatives raised the inadequacy of the negative declaration during the public comment period or prior to the close of the Planning Commission's hearing and thereby preserved the issue for judicial review. In plaintiffs' words: "As long as the inadequacy of the Negative Declaration was raised by anyone during the administrative process, it is properly before the court under the provisions of Public Resources Code section 21177. . . . Each issue is not required to be raised at every hearing, or even at the final hearing." Plaintiffs also claim the evidence demonstrates the CEQA issue was in fact raised before the Board of Supervisors.

Real parties argue plaintiffs failed to exhaust their administrative remedies by not appealing the CEQA issue to the Board of Supervisors as required by judicial case law defining the exhaustion doctrine and by Placer County

Code section 25.140. They claim the evidence demonstrates plaintiffs appealed only the Planning Commission's resolution of the parking issue to the Board of Supervisors.

The parties have not cited a published decision determining whether a party who raises an issue in the first hearing provided on a project but fails to raise that same issue in an administrative appeal remains free to raise that issue in a subsequent court challenge under section 21177, and we have found none ourselves. For the reasons discussed below, we conclude section 21177 and the exhaustion doctrine prevent such an issue from being raised in a court action.[5]

██ "The requirement of exhaustion of administrative remedy is founded on the theory that the administrative tribunal is created by law to adjudicate the issue sought to be presented to the court, and the issue is within its special jurisdiction. If a court allows a suit to go forward prior to a final administrative determination, it will be interfering with the subject matter of another tribunal. (See 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 234, pp. 264-265.) Consequently, the requirement of exhaustion is a jurisdictional prerequisite, not a matter of judicial discretion. (*Environmental Law Fund, Inc.* v. *Town of Corte Madera* (1975) 49 Cal.App.3d 105, 111 [122 Cal.Rptr. 282].)

"The exhaustion doctrine . . . operates as a defense to litigation commenced by persons who have been aggrieved by action taken in an administrative proceeding which has in fact occurred but who have failed to 'exhaust' the remedy available to them in the course of the proceeding itself. (See *Environmental Law Fund, Inc.* v. *Town of Corte Madera, supra,* 49 Cal.App.3d at p. 112.)" (*California Aviation Council v. County of Amador* (1988) 200 Cal.App.3d 337, 340-341 [246 Cal.Rptr. 110] (*California Aviation Council*), fn. omitted.)

██ Section 14.5 of chapter 1514 of the Statutes of 1984, the measure by which section 21177 was enacted, "states that the 'intent of the Legislature in adding Section 21177 . . . [is] to *codify* the exhaustion of administrative

---

[5]Plaintiffs' reliance on *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109 [71 Cal.Rptr.2d 1] is misplaced. That case concerned the effect of section 21177 on persons who raise the grounds of noncompliance with CEQA after the comment period has expired but before the hearing held by the administrative body with final decisionmaking authority has been closed. It did not concern, as this case does, the effect of section 21177 when a person raises an issue of noncompliance before the first administrative body to hear the issue, but fails to do so on appeal to the administrative body with final decisionmaking authority.

remedies doctrine.' (Stats. 1984, ch. 1514, § 14.5, p. 5345; italics added.) It further provides that '[i]t is not the intent [of the legislation] to limit or modify *any exception* to the doctrine of administrative remedies contained in case law.' (*Ibid.*; italics added.) 'We are thus directed to read [section 21177] with reference to a specific common law rule.' (*Cantor* v. *Anderson* (1981) 126 Cal.App.3d 124, 129 [178 Cal.Rptr. 540]; citations omitted.) That rule has to do with the law of administrative remedies as it preceded the enactment of section 21177." (*California Aviation Council, supra,* 200 Cal.App.3d at p. 346 (conc. opn. of Blease, J.).)

Notwithstanding the Legislature's expressed intent, section 21177 is not properly speaking an exhaustion of administrative remedies statute. It requires one to raise issues in the hearing required by CEQA *before* the agency decides whether to approve the negative declaration.

"Ordinarily we use the word remedy as meaning a device to redress a wrong. It is decidedly inappropriate to speak of remedying a wrong which has not occurred and may not occur. Prior to the adoption of a negative declaration under the scheme here in issue there is no wrong to be remediated. Hence, the mere public opportunity to participate in an administrative proceeding prior to the adoption of a negative declaration is not a remedy. The exhaustion of administrative remedies doctrine has never applied where there is no available administrative remedy. (See e.g. *Ramos* v. *County of Madera* (1971) 4 Cal.3d 685, 690-691 [94 Cal.Rptr. 421, 484 P.2d 93]; *Southern Pacific Transportation Co.* v. *State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 945 [237 Cal.Rptr. 191]; 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 238.) [¶] . . . [¶]

". . . [O]nce a wrongful administrative action has been taken the focus of the affected members of the public is sharpened. If some reasonable administrative remedy, such as the right to appeal the action of a planning commission, were afforded to challenge such improper action the doctrine of administrative remedies would bar suit by litigants who failed to employ it. (See generally, *Friends of Mammoth* v. *Bd. of Supervisors* (1972) 8 Cal.3d 247, 267 [104 Cal.Rptr. 761, 502 P.2d 1049].) . . . [T]he right of a person to appear in administrative proceedings leading to the adoption of a negative declaration under CEQA is not properly speaking an administrative remedy which must be exhausted." (*California Aviation Council, supra,* 200 Cal.App.3d at pp. 348-349 (conc. opn. of Blease, J.).)

Rather, the right to appear in a hearing leading to the adoption of a negative declaration is more appropriately viewed as an obligation required to be fulfilled in order to obtain standing. "[T]he plaintiff must plead and

prove facts showing standing, i.e., that he is a person entitled to judicial relief. (See 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 856.) This requirement is sometimes confused with the entirely separate issue of exhaustion of administrative remedies. (See *Kane* v. *Redevelopment Agency* (1986) 179 Cal.App.3d 899 [224 Cal.Rptr. 922].) A person lacking standing may not bring an action notwithstanding that an available administrative remedy was otherwise pursued." (*California Aviation Council, supra,* 200 Cal.App.3d at p. 349 (conc. opn. of Blease, J.).)

Indeed, when the Legislature both enacted and amended section 21177 in 1984 and 1993, respectively, it did so with the intent of limiting the standing of persons who could sue under CEQA, as well as codifying without change the judicially created exhaustion doctrine. Thus, the report by the Senate Committee on Governmental Organization stated the then proposed section 21177 "stipulates that no person shall have *standing* to bring an action under CEQA to attack, review or set aside a finding of a public agency unless that person presents the alleged grounds for noncompliance orally or in writing during the public review process." (Sen. Com. on Governmental Organization, Staff Analysis of Assem. Bill No. 2538 (1983-1984 Reg. Sess.) as amended June 20, 1984, p. 2, italics added.)

Similarly, in 1993 when the Legislature clarified the public review process in which a litigant must first participate, it did so "to limit *standing* to challenge CEQA requirements to those who have objected to the project during the public comment period or prior to the close of the public hearing." (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 919 (1993-1994 Reg. Sess.) Aug. 9, 1993, p. 1, italics added.)

██ No one disputes that plaintiffs raised their objection to the negative declaration "during the public comment period" or "prior to the close of the [Planning Commission's] public hearing on the project before the issuance of the notice of determination." (§ 21177, subd. (a).) Plaintiffs thus had standing to file their petition in the trial court and to prosecute their claim under CEQA *provided* they otherwise exhausted all administrative remedies available to them once the Planning Commission committed what plaintiffs believed was a wrongful act.

"Consideration of whether such exhaustion has occurred in a given case will depend upon the procedures applicable to the public agency in question." (*City of Sacramento* v. *State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 969 [3 Cal.Rptr.2d 643]; see also *Park Area Neighbors* v. *Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1450 [35 Cal.Rptr.2d 334]

[failure to appeal planning commission's actions "in the manner prescribed by the town code" constituted failure to exhaust administrative remedies]; *Browning-Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852, 860 [226 Cal.Rptr. 575].) Here, those procedures were provided by section 25.140 of the Placer County Code.

The Placer County Code allows persons who appear at a Planning Commission hearing to appeal the Planning Commission's decision to the Board of Supervisors. The Placer County Code describes the scope of the appeal hearing as follows: "At the hearing (a hearing conducted 'over again'), the appellate body shall initiate a discussion limited to only those issues that are the specific subject of the appeal, and, in addition, the specific grounds for the appeal. [For example, if the permit for a project approval or denial has been appealed, the entire project will be the subject of the appeal hearing; however, if a condition of approval has been appealed, then *only* the condition and issues directly related to the subject of that condition will be allowed as part of the discussion by the appellate body.]" (Placer County Code, § 25.140, subd. D.4.a., italics in original.)

These procedures thus provided plaintiffs with an appeal from the Planning Commission's decision, but required plaintiffs to specify the particular subject or grounds of the appeal. Although the Board of Supervisors would consider the matter "over again," or in legal parlance, de novo, its review was limited solely to those issues the plaintiffs placed before it.[6]

Here, plaintiffs' appeal placed only the conditional use permit before the Board of Supervisors and only with regard to parking. The appeal form provided a specific notation by which plaintiffs could have appealed the Planning Commission's approval of the negative declaration, but plaintiffs did not specify they were appealing the Planning Commission's decision on that point. Such a failure to raise an issue in an administrative appeal after raising the issue in the first public or administrative hearing constitutes a failure to exhaust administrative remedies and prevents the issue from being raised in a subsequent judicial action. (*Butte View Farms v. Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 971 [157 Cal.Rptr. 476].)

Plaintiffs claim the issue was before the Board of Supervisors because the titles of the County staff report and meeting agenda referenced the negative

[6]Because the scope of the administrative remedy is determined by the procedures applicable to the public agency in question, our decision is limited to the scope of review provided by section 25.140 of the Placer County Code. Other public agencies which serve as lead agencies under CEQA may provide differing types of administrative remedies and appeals with different scopes of review than that at issue here.

declaration. Under the Placer County Code, however, it is the grounds as stated by plaintiffs, not the title given by County staff, that define the scope and nature of the administrative appeal. What staff called the appeal is irrelevant.

Furthermore, staff clearly stated at the appeal hearing the only matter before the Board of Supervisors was the issue of parking. At no time did plaintiffs or their representatives object or otherwise disagree with staff's statements. In fact, after County staff presented the appeal as concerning only parking, plaintiffs' representative stated: "In—*that's true the [County staff]* accurately characterized the issue, however, I guess what we disagree with is—is the staff's interpretation of adequate parking . . . ." (Italics added.) Plaintiffs thus agreed before the Board of Supervisors that parking was the only concern of their appeal.

Plaintiffs argue the Board of Supervisors' adoption of new findings approving the negative declaration demonstrates the CEQA issue was part of the appeal. Plaintiffs misunderstand the burden they bore in pressing the appeal before the Board of Supervisors. Placer County Code section 25.140 stated the appeal involved a hearing "conducted 'over again.' " In other words, the Board of Supervisors' review was a de novo review. However, section 25.140 also stated the Board of Supervisors' de novo review was limited solely to the subject and grounds of the appeal raised by the party appealing the Planning Commission's decision.

Because the Board of Supervisors heard the permit application anew, it was required to adopt all findings necessary to implement its approval of the project. However, it could exercise de novo review solely on the matters raised by plaintiffs. Since plaintiffs did not challenge the Planning Commission's approval of the negative declaration, the Board of Supervisors had no jurisdiction over the negative declaration except to readopt it. Under the provisions of the Placer County Code, the Board of Supervisors' approval of the negative declaration in this instance does not demonstrate the negative declaration was a subject of the administrative appeal.

At oral argument, counsel for plaintiffs claimed Basin Strategies, a planning consultant retained by plaintiffs, wrote a "letter of appeal to the Board of Supervisors that raised the need to require an EIR." In point of fact, that letter was addressed to and received by the County Planning Department during the public comment period on the negative declaration, nearly two months before the Planning Commission's hearing. The letter cannot be considered as an appeal from the Planning Commission's decision because it

was forwarded to the Planning Commission before that body had even made its decision.

There is also nothing in the record indicating plaintiffs or the County treated the letter as anything other than a comment on the County's decision to use a negative declaration. The letter was not forwarded to the Board of Supervisors as part of the appeal. Plaintiffs did not seek to place the letter before the Board of Supervisors and did not object to the County's determination not to forward the letter to the Board of Supervisors.

Plaintiffs assert the administrative record nonetheless demonstrates the lack of environmental review on parking issues was raised at the Board of Supervisors' appeal hearing at least implicitly. The statements referenced by plaintiffs amount at most to generalized environmental comments which do not satisfy the exhaustion requirement. "It is difficult to imagine any derogatory statement about a land use project which does not implicate the environment somehow. More is obviously required." (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197 [200 Cal.Rptr. 855].)

Our interpretation of section 21177 is consistent with the judicially created doctrine of exhaustion of administrative remedies the Legislature sought to codify when it adopted section 21177. The doctrine's purpose is fully served when parties raise all issues before the administrative body with ultimate or final responsibility to approve or disapprove the project, even if those issues were not raised before subsidiary bodies in earlier hearings. (*Browning-Ferris Industries v. City Council, supra,* 181 Cal.App.3d at p. 860.) Were we to conclude the trial court erred in not reviewing an issue not raised before the administrative body below with final decisionmaking authority, we would enable litigants to narrow, obscure, or even omit their arguments before the final administrative authority because they could possibly obtain a more favorable decision from a trial court. Such a result would turn the exhaustion doctrine on its head.

We thus find the uncontroverted facts demonstrate plaintiffs failed to exhaust their administrative remedy regarding their first cause of action. The trial court correctly concluded defendant and real parties were entitled to judgment on that cause of action as a matter of law.[7]

---

[7]Plaintiffs cite to Code of Civil Procedure section 437c, subdivision (g), to fault the trial court's decision for failing to distinguish it was ruling on an affirmative defense and not the merits of the first cause of action, and for failing to specify the reasons for its ruling and refer

III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment of the trial court is affirmed. Costs on appeal are awarded to the defendants County of Placer and Placer County Board of Supervisors and real parties in interest Michael Rafton et al.

Scotland, P. J., and Callahan, J., concurred.

---

to evidence showing no triable issue of fact exists. Because we review the trial court's grant of summary judgment de novo, these arguments are of no moment.
 *See footnote, *ante*, page 577.